**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORY FRYLING and VINCENT HAMON,<br><br>Plaintiffs,<br><br>v.<br><br>THE ASSOCIATED PRESS,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>1. **Violation of California Invasion of Privacy Act (CAL. PENAL CODE §638.51)**<br><br>JURY TRIAL DEMANDED |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Cory Fryling and Vincent Hamon ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), and personal jurisdiction over all parties. Plaintiffs reside in California, within this District. Defendant purposefully directed activities to California by intentionally tracking individuals in California through its website and maintaining offices in California.

## NATURE OF THE CASE

1.    This is a class action against Defendant The Associated Press ("AP" or "Defendant") for violating California laws intended to protect individuals' privacy rights.

2.    Unbeknownst to its users, AP has partnered with various third parties, including Microsoft, to install sophisticated tracking software on the landing page of its website, www.apnews.com (the "AP Website").

3.    Through the use of pixels, cookies, code snippets, and other technologies, these trackers surreptitiously capture and disclose AP website visitors' internet protocol addresses, browser and device information, digital identifiers, location information, browsing history, and other personal information to third

parties for targeted marketing, advertising, and analytic purposes.

4.    Because the trackers capture website visitors' "routing, addressing, or signaling information" without their consent or a court order, the trackers constitute illegal "pen registers" under California's Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE § 638.51.

5.    Plaintiffs bring this action to recover statutory and compensatory damages for harm caused to Plaintiffs and other class members and to prevent Defendant from further violating the privacy rights of California residents.

<u>**JURISDICTION AND VENUE**</u>

6.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and at least one member of the Class is a citizen of a different state than Defendant.

7.    This Court has personal jurisdiction over Defendant because Defendant has purposefully directed its activities to California by intentionally tracking individuals in California through its website, and Defendant conducts substantial business in California by operating two offices in California, including one within this District.

8.    Venue is proper in the Central District of California pursuant to 28

U.S.C. § 1391 because (1) Defendant is subject to personal jurisdiction and resides in this Districta; and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **THE PARTIES**

9.      Plaintiff Cory Fryling is, and has been at all relevant times, a resident and citizen of California, residing in the city of Ontario, within the Central District of California. Mr. Fryling has visited the AP Website numerous times, including on or about June 15, 2025.

10.     Plaintiff Vincent Hamon is, and has been at all relevant times, a resident and citizen of California, residing in the city of Los Angeles, within the Central District of California. Mr. Hamon has visited the AP Website numerous times, including on or about February 28, 2025.

11.     Defendant The Associated Press ("AP") is, and has been at all relevant times, a New York nonprofit corporation with its principal place of business located in New York, New York. AP is a news organization that provides reporting and coverage to media outlets and subscribers throughout the United States, including California. AP is registered to do business in California and maintains at least two offices in California, including one in this District (in Los Angeles). In 2024, the AP

Website had nearly 2.6 billion page views, with 113.5 million monthly views.[1] On information and belief, several million unique individuals visit the AP Website from California each month.

## FACTUAL ALLEGATIONS

### CIPA

12.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens, expressly recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." CAL. PENAL CODE § 630.

13.    To that end, CIPA prohibits, *inter alia*, "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." CAL. PENAL CODE § 638.51.

14.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by a facility from which a wire or electronic communication is transmitted, but not the contents of a communication." CAL PENAL CODE § 638.50(b).

---

[1] *AP by the Numbers: A Look at 2024 Through AP Stats and Figures*, AP https://www.ap.org/about/annual-report/2024-letter-from-the-chair-and-ceo/2024-ap-by-the-numbers/ (last visited July 22, 2025).

15.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for its violation in the amount of $5,000 per violation. CAL. PENAL CODE § 637.2(a)(1).

**IP Addresses**

16.    An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (*e.g.*, 192.555.455.145), Internet Service Providers assign IP addresses to networking devices such as modems or routers (including household modems and routers). The first two sets of numbers indicate the network the device is connected to, and the second set of numbers identify the specific device being used.

17.    IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route a phone call to the correct household, an IP address is a unique number necessary for routing internet communications to the correct location. And just as a phone number can reveal the general location of the caller, an IP address reveals the geographic location of the internet user. For example, free online "IP lookup" services such as iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, county, approximate latitude and longitude coordinates, or even the internet service provider associated with the IP address.

18.    The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. IP addresses can allow companies to target advertisements to users in specific geographic areas with 95% accuracy. For example, businesses who are trying to reach specific demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis or associated with specific events, such as job fairs or festivals. By using IP addresses to target specific households, businesses or events based on their location, advertisers can avoid wasting money on ads unlikely to be seen by their target audience.

19.    Moreover, IP addresses allow businesses to track user interactions and behaviors across multiple websites, building detailed profiles of users' browsing habits and preferences tied to their location. They are particularly powerful for identifying and tracking specific individuals. When individuals use their devices across different locations (such as home, work, coffee shops, or other locations), each location will have its own IP address. By tracking these patterns of movement between different IP addresses, companies can build detailed profiles of individual users' daily routines, movements, and behaviors, which may distinguish them from others who may be accessing the internet through the same IP address (such as other members of the same household). For example, if a user accesses websites on their laptop from their home IP address in the morning, their work IP address during the

day, and then their home IP address again in the evening, this creates a unique pattern that can identify that specific individual. When combined with other information collected by trackers (such as browser type, device type, and user behavior), these IP address patterns allow companies to identify and track specific individuals with remarkable precision, even when multiple people share the same IP address at a given location.

20.    For these reasons, Europe's General Data Protection Regulation regards IP addresses as "personal data, as they can potentially be used to identify an individual."

21.    An IP address is "routing, addressing, or signaling information" by its nature. It is "routing" or "signaling" information because it sends or directs the user's communication from their router to the website with which they are communicating, ensuring that the web content being accessed reaches the user correctly. It is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

22.    An IP address contains geographical location information and can be used to determine the state, city, and zip code where the device is located at a particular point. Collection of IP addresses allows third parties to obtain personally identifying, non-anonymized information, thereby allowing a company to target advertisements towards customers based on their geographic location.

23.    As outlined below, through its Website, Defendant installs one or more of the Adnxs,  Casale Media, PubMatic, Taboola, TripleLift, and Bounce Exchange Trackers (collectively, the "Trackers") on its users' browsers for marketing, advertising, and commercial purposes. Among other personally identifying information, the Trackers collect users' IP addresses that identify their outgoing "routing, addressing, or signaling information."

**Defendant's Surreptitious Installation and Use of Third-Party Trackers**

24.    AP owns and operates the AP Website.

25.    When a user visits the AP Website, whether on a computer or a mobile device, his or her browser sends an "HTTP request" or a "GET" request to AP's servers, and AP responds with an "HTTP response" back to the browser with a set of instructions of how to load and display the Website content.

26.    The HTTP response also causes one or more third-party Trackers to be installed on the user's browser. The Trackers then cause the browser to send identifying information to the Trackers, including the user's unique IP address and other information. The Trackers also store cookies in the users' browser caches, a form of temporary storage.[2]

27.    On the user's subsequent visit(s) to the Website, the Trackers locate the

---

[2] *See* "Web cache," PC MAG, https://www.pcmag.com/encyclopedia/term/web-cache (defining cache as "a folder full of Web pages in the user's computer that is maintained by the Web browser for a period of time") (last visited July 22, 2025).

cookie identifier and cause the browser to again send the cookies, along with the user's IP address, device information, and other personally identifying information, to the third-party.[3]

28.     Cookies are small computer files that are automatically generated when a user visits a website, comprised of strings of text that contain information, such as user IDs, emails, or IP addresses. There are two types of cookies: first-party and third party. First-party cookies are created and stored directly by the web server of a website that a user is visiting, primarily in order to improve website functionality and the user's experience. By contrast, third-party cookies are placed on the website by someone other than the owner of the website to collect user data and are often used by marketing companies or ad networks for tracking and/or advertising purposes. Unlike first-party cookies, which only gather user data when users interact with the owner's website, third-party cookies track users across multiple websites to provide a more comprehensive picture of users' behavior.[4]

29.     The Trackers that AP is installing on Website users' browsers analyze and store the data collected from the Website users to more accurately target

---

[3] In the event that a user clears his or her cookies, the Tracker(s) will be wiped from his or her browser cache, and the next time he or she visits the Website(s), the process will begin all over again.

[4] *What is a Third-Party Cookie?*, TECHTARGET (Oct. 10, 2024) https://www.techtarget.com/whatis/definition/third-party-cookie; *see also* "Cookie," PC MAG, https://www.pcmag.com/encyclopedia/term/cookie (last visited July 22, 2025).

advertising to them and to analyze and optimize the performance of marketing campaigns – for the ultimate goal of AP earning additional revenue.

30.     The personal information obtained and distributed by Defendant has significant economic value as consumers' personal information is viewed as a form of currency in the e-commerce industry. Consumers, like Plaintiffs and all members of the putative Class, suffer economic injury as a result of AP's access to and use of their personal information.

31.     Defendant does not request or obtain consent from users before installing the Trackers on their browsers, nor are users presented with any pop-up window, banner, or any other notification informing them that Defendant will be installing the Trackers or collecting their IP addresses and other personally identifying information.

32.     Because the Trackers capture website visitors' "routing, addressing, or signaling information" (in the form of their IP addresses) without their consent or a court order, they constitute illegal "pen registers" under CIPA. CAL. PENAL CODE § 638.51.

**The Adnxs Tracker**

33.     One of the Trackers installed by Defendant on the AP Website is Adnxs.com (the "Adnxs Tracker").

34.     The Adnxs Tracker was developed by Xandr, Inc., a software company

acquired by Microsoft in 2021. Microsoft owns and operates the Adnxs Tracker, which is part of a suite of tools provided by Microsoft to its customers as part of its Microsoft Advertising ecosystem (also called "Microsoft Invest").

35.    Microsoft Advertising (*i.e.*, the ADNXS Tracker) touts its "innovative programmatic offerings," enabling advertisers and publishers to "[r]each the right audience across their digital life through rich ad experiences, consumer intelligence and within our expansive network, including exclusive partnerships."[5] Microsoft Advertising provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[6]

36.    In other words, Microsoft facilitates the selling of Defendant's Website users to interested advertisers, who bid to show those users advertisements that are targeted to their identity and location.

37.    To do this, Microsoft utilizes data from its cookie store. The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[7]

---

[5]    *Discover    What's    Possible*, MICROSOFT    ADVERTISING, https://about.ads.microsoft.com/en#ad-technology (last visited July 22, 2025).

[6]    *About    Microsoft    Invest*, MICROSOFT    (Feb.    12,    2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

[7] *Id.*

38.     Defendant is one of Microsoft Advertising's customers. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, AP's server sends an HTTP response with directions to install the Adnxs Tracker on the user's browser, and the Adnxs Tracker instructs the user's browser to automatically transmit the user's IP address to Microsoft and stores cookies on the user's browser.

39.     One of the cookies installed by the Adnxs Tracker on users' browsers when they visit the AP Website is called the uuid2 cookie.[8] The uuid2 cookie is used by website operators such as Defendant to engage in targeted advertising and measure the performance of those advertisements.[9]

40.     The persistent nature of the uuid2 cookie allows Microsoft to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique uuid2 cookie. While a user's IP address may change between Website visits (for instance, when accessing the AP Website from different locations), the identifier associated with the uuid2 cookie remains constant for approximately 90 days,[10] unless a user manually "clears" their cookies (upon which the Adnxs Tracker will automatically generate a new, unique uuid2 cookie).

---

[8] *uuid2*, COOKIE.IS, https://www.cookie.is/uuid2 (last visited July 22, 2025). The uuid2 cookie was developed by AppNexus, Xandr's predecessor. *Id.*

[9] *Id.*

[10] *Id.*

41.     Through these mechanisms, the uuid2 cookie engages in a process of "fingerprinting" each user who browses the AP Website. When a user visits the AP Website, Microsoft collects their IP address and automatically associates it with any existing uuid2 cookie on their browser. This enables Xandr/Microsoft to link multiple IP addresses to the same user over time, creating a comprehensive record of the user's geographic locations and Website activities across all their devices, including the various IP addresses and locations from which the AP Website was accessed.

42.     By collecting Website users' IP addresses and disclosing them to Microsoft, AP enables Microsoft to serve sponsored content recommendations targeted to users based on their geographic locations. These advertisements appear alongside or within AP Website content, generating revenue for AP each time a user clicks on them.

43.     Microsoft also integrates with Wunderkind's Bounce Exchange Tracker (discussed *infra*) on the AP Website to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users. In other words, when users visit the AP Website, Microsoft collects users' IP addresses through its Adnxs Tracker to provide to advertisers interested in showing an advertisement to Defendant's Website users, enriching that information by integrating with the Bounce Exchange Tracker, and ultimately enabling Defendant

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

to monetize its Website and maximize revenue by collecting and disclosing user information.

44.    The following are screenshots demonstrating the operation of the Adnxs Tracker on an AP Website visitor's browser – specifically, Defendant's sharing of the user's IP address and additional device information with Microsoft and placement of the uuid2 cookie on the user's browser. In this example of the information exchanged while a user browses the AP Website (see Box 2), the user's browser and device information appear in Box 1 and the user's IP address appears in Box 3. This information is transmitted through the Adnxs Tracker which Defendant installed on the user's browser along with the uuid2 cookie, as reflected in Box 4.



## The Casale Media Tracker

45.    A second third-party Tracker installed by Defendant on the AP Website is the CasaleMedia.com Tracker (the "Casale Media Tracker"), developed by Index Exchange, Inc. ("Index Exchange"), formerly known as Casale Media.

46.    The Index Exchange "hosts digital auctions that help [its] clients buy

15

and sell online ads," such as those found on websites.[11]  The Index Exchange "act[s] as an intermediary between buyers and sellers" – in other words, it "connects Ad Partners with Publishers [*e.g.*, the AP][12] to deliver relevant digital ads to [consumers]."[13]

47.    The Casale Media Tracker is a tool used within Index Exchange's advertising ecosystem that collects user data to refine advertisement targeting, thereby improving advertisement effectiveness.

48.    In other words, by storing and analyzing information collected from website visitors, the Casale Media Tracker enables the Index Exchange's customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits.

49.    AP is one of the Publishers with whom the Index Exchange partners. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, and AP's server sends an HTTP response with directions to install the Casale Media Tracker on the user's browser, and the Casale Media Tracker instructs

---

[11] *Exchange Platform Privacy Policy*, INDEX EXCHANGE (Jan. 2, 2025) https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/#section-2.

[12] As explained in the privacy policy, "Publishers own or operate the Digital Properties that [users] may use or visit." *Id.*

[13] *Id.*

16

the user's browser to automatically transmit the user's IP address to the Index Exchange and stores cookies on the user's browser.

50.    One of the cookies employed by the Index Exchange is the "Casale Media cookie," or "CMID."  The CMID is a "[u]nique identifier that websites and servers associate with [users'] web browser at Index Exchange and across sites and servers."[14] In other words, "[w]ith our cookie stored in your web browser, we are able to recognize your browser across different sites."[15]

51.    Some of the personal data the Index Exchange processes when users visit the AP Website include (i) "digital identifiers," such as cookie ids, device advertising IDs, and "third-party IDs"; (ii) "browser and device information," such as the type and version of a user's browser, browser settings, user agent, IP address, and device type; (iii) "location information," such as city, country, zip code, and longitude or latitude; and (iv) "other data" provided by Publishers to improve advertising, such as a users' interests or demographic information.[16]

52.    The persistent nature of the CMID cookie allows the Index Exchange to maintain continuous tracking of users across multiple browsing sessions by

---

[14] *Exchange Platform Cookie Notice*, INDEX EXCHANGE, (Jan. 2, 2025) https://www.indexexchange.com/privacy/index-exchange-platform-cookie-notice/.

[15] *Id.*

[16] *Exchange Platform Privacy Policy*, INDEX EXCHANGE (Jan. 2, 2025) https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/#section-2.

linking new IP addresses to the unique CMID cookie. While a user's IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the CMID cookie remains constant for one year unless a user manually "clears" their cookies (upon which the Index Exchange will automatically generate a new, unique CMID cookie).[17]

53.     Based on Plaintiffs' investigation, the Index Exchange also shares users' IP addresses with various third parties – including Temu, an online marketplace that leverages its China-based supply chain to deliver a wide variety of low-cost goods worldwide and relies heavily on targeted advertising.

54.     The following are screenshots demonstrating the operation of the Casale Media Tracker on an AP Website visitor's browser – specifically, Defendant's sharing of the user's IP and additional device information with the Index Exchange and placement of the CMID cookie on the user's browser, as well as the Index Exchange's sharing of the user's IP address with Temu:

---

[17] *Exchange Platform Cookie Notice*, INDEX EXCHANGE, (Jan. 2, 2025) https://www.indexexchange.com/privacy/index-exchange-platform-cookie-notice/.

55.    In the image above, the user's IP address (highlighted in the red box in the right-hand column) and the user's device information (highlighted in the first red box in the left-hand column) is shared with temu.com (the title of the transmission highlighted in the red box at the top left of the image). The operative Tracker through which the information is being sent is Casale Media, as reflected in the second red

box in the left-hand column.

56.     In this second image also taken during a user session on the AP Website (see Box 2), the CMID Cookie that was placed on the user's browser is presented in Box 4. As seen in Box 3, the information is being shared with Temu.com.



**The PubMatic Tracker**

57.     Another third-party tracker installed by Defendant on the AP Website is the PubMatic Tracker.

58.     PubMatic, Inc. ("PubMatic"), a registered data broker in the state of California,[18] develops and implements online advertising software and strategies for the digital publishing and advertising industry. PubMatic is "one of the world's leading scaled digital advertising platforms," that "exist[s] to enable content creators to run a more profitable advertising business."[19] It "offer[s] more transparent advertising solutions to publishers, media buyers and data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[20]

59.     In other words, by storing and analyzing information collected from website visitors, the PubMatic Tracker enables its customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies'

---

[18]     *See Data Broker Registration for PubMatic, Inc.*, CAL. DEP'T JUST., https://www.oag.ca.gov/data-broker/registration/186702 (last visited July 23, 2025). California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. CAL. CIV. CODE § 1798.99.80(c). Any entity that qualifies as a "data broker" under California law must specifically register as such. CAL. CIV. CODE § 1798.99.82(a).

[19]     *The Supply Chain of the Future. Built for You.*, PUBMATIC, https://pubmatic.com/about-us/ (last visited July 23, 2025).

[20]     *Id.*

21

websites to drive brand awareness and increase website visits.

60.    To accomplish these goals, PubMatic uses cookies and a variety of other tracking tools to receive, store, and analyze information collected from visitors to its partners' websites. As PubMatic explains:

> We partner with website publishers to deliver advertising that we believe may interest you based on your activity on our publishers' websites and other websites over time. We set and access cookies on your computer or other device to perform this service and may also use web logs, pixel tags, or web beacons. These cookies and other technologies are used to deliver advertisements that are more relevant to you and your interests. They are also used to limit the number of times you see an advertisement as well as to help measure the effectiveness of the advertising campaign.[21]

61.    AP is one of the publishers with whom PubMatic partners. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, and AP's server sends an HTTP response with directions to install the PubMatic Tracker on the user's browser, and the PubMatic Tracker instructs the user's browser to automatically transmit the user's IP address to PubMatic and stores cookies on the user's browser.

62.    PubMatic assigns Online Identifiers to users' browsers "to enable our Ad Services to determine within a reasonable level of confidence that a browser or device is the same with which our Ad Services have previously interacted." The

---

[21] *Platform Cookie & Other Similar Technologies Policy*, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/ (last visited July 23, 2025).

reason for doing this, as PubMatic explains, is that "[i]f we (or our Media Buyers) can identify a browser or device, it increases the value of that advertisement…."[22]

63.     The information collected by the PubMatic Tracker and associated with the Online Identifiers described above includes: (1) "Browser and Device Information," such as IP address, device type and model, operating system and web browser type, (2) "Behavioral Information," such as how the user interacts with Defendant's website and session start/stop time, (3) "Ad Interaction," such as the type of ad, whether the user interacted with the ad, and whether the user purchased or installed the product or service advertised, and (4) "Geolocation Information," derived from the location of a user's device via its IP address.[23]

64.     In addition, PubMatic may also "combine, merge and/or augment this user information with other information received from its clients, including demographic or interest data and content viewed.[24] This helps PubMatic to further "customize and more effectively tailor the ads we display to End Users and to optimize the display of ads."[25]

---

[22]      *Advertiser    Platform    Privacy    Policy*,    PUBMATIC, https://pubmatic.com/legal/privacy-policy/#userinfowecollect (last visited July 23, 2025).

[23] *Id.*

[24] *Id.*

[25] *Id.*

65.     Two of the PubMatic cookies employed on the AP Website are the "KADUSERCOOKIE" and the KRTBCOOKIE" (the "PubMatic Cookies").

66.     The KADUSERCOOKIE is used "to uniquely identify each browser or device from which an individual user visits [PubMatic's] partners' websites."[26]

67.     The KRTBCOOKIE is used "to correlate [PubMatic's] user IDs with those of [PubMatic's] partners (such as demand side platform clients or other advertising technology companies)."[27]  PubMatic "pass[es] the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements," which "enables the partner to make better decisions about whether to display an advertisement to [the Website visitor]."[28]

68.     In other words, the PubMatic Cookies are used to enable targeted advertising toward AP Website visitors.

69.     The persistent nature of the PubMatic Cookies allows PubMatic to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to these unique cookies. While a user's IP address may change between Website visits (for instance, when accessing the AP Website from different

---

[26]  *Platform Cookie & Other Similar Technologies Policy*, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/ (last visited July 23, 2025).

[27]  *Id.*

[28]  *Id.*

1    locations), the identifiers associated with the PubMatic Cookies remain constant for

2    approximately 90 days, unless a user manually "clears" their cookies (upon which

3    the PubMatic Tracker will automatically generate new, unique PubMatic Cookies).

4

5         70.    The following are screenshots demonstrating the operation of the

6    PubMatic Tracker on an AP Website visitor's browser – specifically, Defendant's

7

8    sharing of the user's IP address and additional information about their device with

9    PubMatic and placement of the PubMatic Cookies on the user's browser:



71.    In this example of a user interacting with the AP Website (first red box

in the left-hand column), the user's device information (second red box in the left-

hand column) and IP address (red box in the center column) are being collected and shared with PubMatic via its KADUSERCOOKIE and KRTBCOOKIE (red box in the right-hand column).

**The Taboola Tracker**

72.    Another third-party tracker installed by Defendant on the AP Website is the Taboola Tracker. Taboola, Inc. ("Taboola"), a registered data broker in the State of California,[29] is a content recommendation and integrated advertising platform for publishers to monetize their websites by displaying sponsored content and personalized recommendations to website visitors. Taboola develops, owns, and operates the Taboola Tracker.

73.    Taboola claims that it can "[l]everage scale, first-party data, AI, and private-focused tech to connect with the right audiences and drive performance."[30] For publishers such as Defendant, Taboola offers the opportunity to grow their ad revenue by, *inter alia*, "[m]atch[ing] users with relevant ads using advanced audience targeting and performance AI technology to maximize results."[31]

74.    One of the ways Taboola accomplishes these goals is by placing

---

[29] *See Data Broker Registration for Taboola, Inc.*, CAL. DEP'T JUST., https://www.oag.ca.gov/data-broker/registration/186589 (last visited July 23, 2025).

[30] *Performance Beyond Search and Social*, TABOOLA, https://www.taboola.com/ (last visited July 23, 2025).

[31] *The Future of Publishing*, TABOOLA, https://www.taboola.com/publishers/ (last visited July 23, 2025).

advertising cookies on its Customers'[32] websites. As explained in its Cookie Policy, Taboola "use[s] information collected via cookies on our Customers' websites to make the Services more enjoyable, to improve the functionality of the Services, and to tailor the content that [it] displays to [users]."[33]

75.     In other words, by storing and analyzing information collected from website visitors, the Taboola Tracker enables its Customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase visits to their websites.

76.     AP is one of Taboola's Customers. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, and AP's server sends an HTTP response with directions to install the Taboola Tracker on the user's browser, and the Taboola Tracker instructs the user's browser to automatically transmit the user's IP address to Taboola and stores cookies on the user's browser.

77.     One of the cookies placed by Taboola on users' browsers is the "t_gid" cookie, which "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on

---

[32] Defined in Taboola's privacy policy as "a publisher, advertiser, or other content provider that has a contractual relationship, with Taboola." *Taboola Privacy Policy*, TABOOLA (Apr. 11, 2025), https://www.taboola.com/policies/privacy-policy.

[33]     *Taboola     Cookie     Policy*,     TABOOLA     (Dec.     4,     2024) https://www.taboola.com/policies/cookie-policy.

interactions with an advertiser or publisher."[34]

78.    The information collected by the t_gid cookie includes information about users' operating systems, the web pages they accessed, the website that led a user to the Customer's website, the dates and times the user accessed the website, event information, and location information.[35]

79.    Further, the persistent nature of the t_gid cookie allows Taboola to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique t_gid cookie. While a user's IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the t_gid cookie remains constant for one year unless a user manually "clears" their cookies (upon which Taboola will automatically generate a new, unique t_gid cookie).[36]

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

80.    The following are screenshots demonstrating the operation of the Taboola Tracker on an AP Website visitor's browser – specifically, Defendant's sharing of the user's IP address and other device information with Taboola and placement of the t_gid cookie on the user's browser:



Box 1: https://trc.taboola.com

Box 2:
Sec-Ch-Ua-Platform: "macOS"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/131.0.0.0 Safari/537.36
Sec-Ch-Ua: "Google Chrome";v="131", "Chromium";v="131", "Not_A Brand";v="24"

Box 3: Referer: https://apnews.com/

Box 4: "umip":"194.195.93.66"

Box 5:



| Request cookies | 1 | ^ |
| --- | --- | --- |
| Name | Value | |
| t_gid | 170029FA01D7612436... | > |

81.     In this example of a user session on the AP Website (see Box 3), the user's device and browser information (see Box 2) along with the IP address (see Box 4) are being collected and shared with Taboola through the t_gid cookie (see Box 5).

**The TripleLift Tracker**

82.     Another third-party tracker installed by Defendant on AP Website visitors' browsers is the TripleLift Tracker.

83.     TripleLift is a software-as-a-service company that "provides a suite of technology products that facilitate digital advertising."[37] TripleLift develops, owns, and operates the TripleLift Tracker.

84.     TripleLift boasts that it is "redefining digital advertising by delivering

---

[37] *TripleLift Advertising Technology Platform Cookie Notice*, TRIPLELIFT, https://triplelift.com/advertising-technology-platform-cookie-notice/ (last visited July 23, 2025).

innovative, high-quality ad experiences that create real connections."[38] "By combining cutting-edge creative technology, actionable data, advanced targeting, and premium inventory, [TripleLift] empowers publishers and brands to discover new opportunities, achieve measurable outcomes, and engage audiences seamlessly across every platform."[39]

85.    In other words, by storing and analyzing information collected from website visitors, the TripleLift Tracker enables its customers to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits.

86.    One way that TripleLift accomplishes these goals is by using cookies.[40]

87.    Defendant is one of TripleLift's customers. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, and AP's server sends an HTTP response with directions to install the TripleLift Tracker on the user's browser, and the TripleLift Tracker instructs the user's browser to automatically transmit the user's IP address to TripleLift and stores cookies on the user's browser.

---

[38] *Creative That Performs*, TRIPLELIFT, https://triplelift.com/about/ (last visited July 23, 2025).

[39] *Id.*

[40] *TripleLift Advertising Technology Platform Cookie Notice*, TRIPLELIFT, https://triplelift.com/advertising-technology-platform-cookie-notice/ (last visited July 23, 2025).

88.    One of the cookies placed by TripleLift on AP Website users' browsers is the "TLUID" cookie.  This cookie is "used to identify web browsers across sites and over time for ad serving purposes."[41]

89.    The persistent nature of the TLUID cookie allows TripleLift to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique TLUID cookie. While a user's IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the TLUID cookie remains constant for ninety days unless a user manually "clears" their cookies (upon which TripleLift will automatically generate a new, unique TLUID cookie).[42]

90.    Another cookie utilized by TripleLift is the "sync" cookie, which enables TripleLift to conduct "user syncing" by aligning unique user identifiers across its system and partner platforms. Like the TLUID cookie, the sync cookie has a 90-day persistent lifespan.[43]

91.    One third party with whom TripleLift shares website visitors' information through user sync is StackAdapt, a programmatic advertising platform that enables advertisers and agencies to buy, manage, and track digital media

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

campaigns.[44]

92.    The following are screenshots demonstrating operation of the TripleLift Tracker on an AP Website visitor's browser – specifically, Defendant's sharing of the user's IP address and additional device information with TripleLift and placement of the TLUID cookie on the user's browser, as well as TripleLift's sharing of that information through user sync with StackAdapt:

---

[44] *The Leading Technology That Connects*, STACKADAPT, https://www.stackadapt.com/ (last visited July 23, 2025).

**Box 1**



**Box 1:**



https://eb2.3lift.com

**Box 2:**

Referer: https://apnews.com/

**Box 5:**

| Name | Value | |
|---|---|---|
| tluid | 4424779589156924485... | > |
| receive-cookie-depre... | 1 | > |

**Box 3:**

Set-Cookie: sync=
CgoIgAIQv4uMssMyCgoIoQEQv4uMssMyCgoI4gEQv4uMssMyCgoI5gEQv4uMssMyCgoIhwIQv4uMssMyCgkIOhC_i4
yywzIKCQgbEL-LjLLDMgoKCIwCEL-LjLLDMgoKCKwCEL-LjLLDMgoJCF8Qv4uMssMy; Max-Age=7776000;
Expires=Sat, 05 Apr 2025 11:39:09 GMT; Path=/sync; Domain=.3lift.com; Secure;
SameSite=None

**Box 4:**

<img id=27 src="
https://sync.srv.stackadapt.com/sync?nid=13&gdpr=0&gdpr_consent=&gpp=&gpp_sid=">

93.    In the above example of a user session on the AP Website (see Box 2), the TLUID cookie is present (see Box 5) and sharing information about the user's device with StackAdapt (see Box 4).



94.    The second image shows the user's information being shared with StackAdapt, as reflected in the red box at the top of the image. The user's IP address (red box in the right-hand column), browser, and device information (second red box in left-hand column) are being collected and shared through StackAdapt's cookies (the "sa-user" data in the first red box in the left-hand column).

**The Bounce Exchange Tracker**

95.    Another third-party tracker installed by Defendant on AP Website

35

visitors' browsers is the Bounce Exchange Tracker. This Tracker is developed, owned, and operated by Wunderkind Corp. f/k/a BounceX ("Wunderkind").

96.     Wunderkind, a registered data broker in the State of California,[45] is a behavioral automation software and analytics company that helps its clients (website publishers such as Defendant) "drive higher engagement from their website visitors" through its advertising platforms.[46]

97.     Wunderkind is an "AI decisioning platform that helps brands drive more revenue by increasing reach through identity," through its "proprietary identity graph [that] resolves anonymous traffic into known users . . . ."[47] According to Wunderkind, its "custom [ad] placements are designed to fit both our advertiser and publishing partners' needs."[48] Wunderkind boasts that "[a] WunderKIND Ad experience drives results."[49]

98.     The way this works is through the collection by Wunderkind of users'

---

[45] *See Data Broker Registration for Wunderkind Corp.*, CAL DEP'T JUST., https://www.oag.ca.gov/data-broker/registration/191359 (last visited July 23, 2025).

[46]     *Wunderkind Corporation: Privacy Policy*, WUNDERKIND, https://www.wunderkind.co/privacy/ (last visited July 23, 2025).

[47]     *How Wunderkind Converts Identity into Revenue*, WUNDERKIND, https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/ (last visited July 23, 2025).

[48]     *Stop Annoying Your Audience with Intrusive Ads*, WUNDERKIND, https://www.wunderkind.co/how-it-works/advertising-solutions-for-advertisers-and-publishers/ (last visited July 23, 2025).

[49] *Id.*

36

personal information – including, but not limited to "[b]rowsing history, search history, [and] information on a consumer's interaction with a website, application, or advertisement" and "may transfer data collected through … [Wunderkind's] marketing activities to entities such as "(i) website analytics vendors, who collect cookie and website engagement information to help understand website performance, (ii) advertising vendors, who collect cookie and website engagement information to target relevant advertising, and (iii) email marketing and lead database vendors, who collect email address and other personal information to improve email marketing efforts."[50]

99.    Indeed, Wunderkind claims that its "Identity Network recognizes over 9 billion consumer devices and 1 billion consumer profiles and stores them in [its] Identity Graph."[51] Wunderkind is able to do this by matching the information it already has about users with the information it is collecting via the Bounce Exchange Tracker.

100.    The information collected by the Bounce Exchange Tracker includes "IP address, browser type, operating system, Internet Service Provider, referrer address, the time/date an ad is served and the site or mobile app that the ad is served

---

[50]    *Wunderkind Corporation: Privacy Policy*, WUNDERKIND, https://www.wunderkind.co/privacy/ (last visited July 23, 2025).

[51]    *How Wunderkind Converts Identity into Revenue*, WUNDERKIND, https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/ (last visited July 23, 2025).

in addition to other log file information," which is "used to offer products and Services designed to help our Clients better understand how their websites are being utilized, draw insights on how to better engage Users on their sites, to deliver more relevant advertising messages based upon the User visits to their sites, and to provide Clients with ad delivery reports."[52]

101.   In addition, "[a]s with most web technologies, Wunderkind may leverage cookies to track user history across pages and sessions. Cookies allow us to maintain information about end-users, improve the user shopping experience, and make intelligent segmentation decisions when serving onsite, triggered email, and text campaigns."[53]

102.   In other words, Wunderkind stores and analyzes information collected from website visitors and compiles comprehensive user profiles by tracking these visitors across the internet. It provides that valuable information to its customers, such as Defendant, enabling them to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand

---

[52]   *Wunderkind Corporation: Privacy Policy*, WUNDERKIND, https://www.wunderkind.co/privacy/ (last visited July 23, 2025).

[53]   *Wunderkind Cookies and Consent Management Platforms*, WUNDERKIND SUPPORT,         https://support.wunderkind.co/hc/en-us/articles/25775724847771-Wunderkind-Cookies-and-Consent-Management-Platforms (last visited July 23, 2025); *see also Wunderkind Corporation: Privacy Policy*, WUNDERKIND, https://www.wunderkind.co/privacy/ (last visited July 23, 2025).

awareness and increase website visits.

103.    Defendant is one of Wunderkind's customers. When a user visits the AP Website, his or her browser sends an HTTP request to AP's server, and AP's server sends an HTTP response with directions to install the Bounce Exchange Tracker on the user's browser, and the Bounce Exchange Tracker instructs the user's browser to automatically transmit the user's IP address to Wunderkind and stores cookies on the user's browser.

104.    Two of the cookies installed by the Bounce Exchange Tracker on AP Website    users'    browsers    are    bounceClientVisitXXXX    and bounceClientVisitXXXXc (the "Bounce Cookies").

105.    The following are screenshots demonstrating operation of the Bounce Exchange Tracker on an AP Website visitor's browser – specifically, Defendant's sharing of the user's IP address, location, and additional device information with Wunderkind and placement of the Bounce Cookies on the user's browser:



106.    In the first image, the user's browser and device information are being collected and shared by the Bounce Exchange Tracker, as reflected in the red box at the top of the image.

107.    In the second image, additional user device information and specific geographic location (including the user's state, city, zip code, latitude and longitude) are being collected and shared (see red boxes in the left-hand column) by the Bounce Exchange Tracker, as reflected in the red box at the top of the image.

**Plaintiffs' Experiences**

Plaintiff Cory Fryling

108.    Plaintiff Cory Fryling has visited the AP Website numerous times on his computer to read news articles, including on or about June 15, 2025.

109.    On various occasions while visiting the AP Website, Mr. Fryling has noticed pop-up advertisements for websites he has previously visited. For example, on or about June 27, 2025, Mr. Fryling visited the AP Website and an ad popped up for Harry & David, a retailer where he had recently shopped.

110.    On information and belief, during Mr. Fryling visits to the AP Website, Defendant caused one or more of the Trackers to be installed on his browser, and Defendant used the Trackers to collect Mr. Fryling's personal information, including his IP address, and to track his location through the use of cookies.

111.    Defendant used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Mr. Fryling's location, and ultimately boost its and its advertisers' revenue.

112.    When Mr. Fryling visited the AP Website, he was unaware of Defendant's tracking practices.

113.    Mr. Fryling did not provide consent prior to the installation of the Trackers on his browser.

114.    Defendant did not obtain a court order before installing or using the

Trackers on Mr. Fryling's browser.

Plaintiff Vincent Hamon

115.   Plaintiff Vincent Hamon has visited the AP Website numerous times on his computer to read news articles, including on or about February 28, 2025.

116.   On information and belief, during Mr. Hamon's visits to the AP Website, Defendant caused one or more of the Trackers to be installed on his browser, and Defendant used the Trackers to collect Mr. Hamon's personal information, including his IP address, and to track his location through the use of cookies.

117.   Defendant used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Mr. Hamon's location, and ultimately boost its and its advertisers' revenue.

118.   When Mr. Hamon visited the AP Website, he was unaware of Defendant's tracking practices.

119.   Mr. Hamon did not provide consent prior to the installation of the Trackers on his browser.

120.   Defendant did not obtain a court order before installing or using the Trackers on Mr. Hamon's browser.

## CLASS ACTION ALLEGATIONS

121.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

and, pursuant to Federal Rule of Civil Procedure 23, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

122. Plaintiffs propose the following Class, consisting of and defined as follows:

> All California residents who accessed APnews.com and had their IP addresses and/or other personal information collected by one or more third-party trackers, including but not limited to the Adnxs Tracker, the Casale Media Tracker, the PubMatic Tracker, the Taboola Tracker, and the Bounce Exchange Tracker, during the relevant time period.

123. Excluded from the Class are Defendant, its subsidiaries, parents, successors, predecessors, assigns, agents, affiliates, and any entity or division in which Defendant has a controlling interest; current or former employees, officers and directors of Defendant; and the Judge to whom this case is assigned and the Judge's staff. Plaintiffs reserve the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability.

124. **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the entire Class is currently unknown to Plaintiffs at this time; however, given that, on information and belief, Defendant has millions of visitors to its Website, it is reasonable to presume that the number of Class members is in the thousands. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

125.  **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

A.  Whether the Trackers are pen registers as defined by law;

B.  Whether Defendant had consent from Plaintiffs and Class members to collect their IP addresses, device fingerprinting data, or other personal information; and

C.  Whether Defendant sought or obtained a court order to utilize the Trackers on its Website.

126.  **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class Members, visited the AP Website and had their IP addresses and other personal information collected by the Trackers.

127.  **Adequacy**: Each Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom they are similarly situated, as demonstrated herein. Plaintiffs' attorneys, the proposed class counsel, are experienced in handling consumer and other class actions.

128.  **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of the Class. The elements of the legal claims brought by Plaintiffs and Class Members are capable of proof at trial through evidence that is common to the Class rather than

individual to its members.

129.  **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because class-wide damages are essential to induce Defendant to comply with California law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

**CAUSES OF ACTION**

**COUNT ONE**
**VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT**
**CAL. PENAL CODE § 638.51**

130.  Plaintiffs repeat, re-allege, and incorporate by reference, the preceding paragraphs above as if fully set forth herein.

131.  California Penal Code Section 638.51 prohibits any person from using a "pen register" without a court order or consent.

132.  The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted,

but not the contents of a communication." CAL. PENAL CODE § 638.50(b).

133.    The Trackers are "pen registers" because they are devices or processes that captured "the routing, addressing, or signaling information" – the IP addresses – from the electronic communications transmitted by Plaintiffs' computers and/or mobile devices. CAL. PENAL CODE § 638.51(a).

134.    Defendant installed the Trackers on Plaintiffs' browsers and used the Trackers to collect Plaintiffs' IP addresses and other personal information and to track Plaintiffs.

135.    IP addresses constitute routing and addressing information and do not reveal the contents of the communications between users and the AP Website.

136.    Plaintiffs did not provide their consent prior to Defendant's installation or use of the Trackers on their browsers.

137.    Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' IP addresses and other personal information.

138.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. Award statutory damages to Plaintiffs;

D. Award compensatory damages to Plaintiffs;

E. Award reasonable attorneys' fees and costs to Plaintiffs;

F. Award pre-judgment and post-judgment interest on such monetary relief; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: August 1, 2025

**KAHN SWICK & FOTI, LLC**

By: */s/ Kim E. Miller*
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California  90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*